**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ISRAEL CALLERO MENDEZ, 01679093,** Petitioner, | ) | |
| **v.** | ) | **No. 3:14-CV-2973-P** |
| **WILLIAM STEPHENS, Director, Texas Dept. Of Criminal Justice, Correctional Institutions Division,** Respondent. | ) | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

This case has been referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and a standing order of reference from the district court. The Findings, Conclusions and Recommendation of the Magistrate Judge are as follows:

### I. Procedural Background

Petitioner filed this petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. He challenges his conviction for capital murder. *State of Texas v. Israel Callero Mendez*, No. F-0859468-N (195th Jud. Dist. Ct., Dallas County, Tex., Oct. 29, 2010). Petitioner was sentenced to life in prison.

On April 18, 2012, the Fifth District Court of Appeals affirmed the conviction and sentence. *Mendez v. State*, No. 05-10-01461-CR (Tex. App. – Dallas, Apr. 18, 2012). On September 12, 2012, the Court of Criminal Appeals denied Petitioner's petition for discretionary review. PDR No. 589-12.

On November 29, 2013, Petitioner filed a state habeas petition challenging his conviction. *Ex parte Mendez*, No. 81,678-01. On August 6, 2014, the Court of Criminal Appeals denied the petition without written order.

On August 14, 2014, Petitioner filed the instant § 2254 petition. He argues:

1. His conviction is void because the trial court lacked jurisdiction;
2. There was no charging instrument, so he was denied the right to be informed of the nature of the accusation against him;
3. The indictment was not amended, or not properly amended, thereby denying him due process;
4. The evidence was insufficient to support the conviction because the indictment was not properly amended;
5. The jury charge was fundamentally defective because it allowed him to be convicted on a theory of burglary that was not included in the indictment;
6. He received ineffective assistance of trial counsel when:
   - (a) counsel failed to move for a directed verdict based on the faulty indictment;
   - (b) counsel failed to object to the indictment;
   - (c) counsel failed to object to the jury charge on the ground that it was based on a faulty indictment.

On February 27, 2015, Respondent filed his answer. Petitioner did not file a reply. The Court now determines the petition should be denied.

## II. Factual Background

The following factual background is taken from the opinion of the Fifth District Court of Appeals.

> Shortly before 2 a.m. on August 18, 2008, appellant drove Tomas Hernandez, David Hernandez, and Nestor Hernandez to Felix Aguirre's home. The Hernandez men, wearing masks and gloves, kicked in the door to Aguirre's home and, while entering, yelled "police" to scare anyone who might pose a threat. As Aguirre's wife and children awakened, Tomas demanded to know the location of Aguirre. Tomas found Aguirre in a bedroom, pulled him out of bed, and led him to the kitchen, where he shot him once in the head and killed him. Aguirre's eldest son charged at Tomas, who then fired the gun at the son but missed. The men immediately fled the house.
>
> Outside, they ran to the location where they believed appellant would be waiting, but he was not there. The men continued to run, and during their escape, Nestor became separated from Tomas and David. Tomas and David made it to a pay phone, where they called appellant to pick them up. Nestor was arrested by the police walking in the area not long after the shooting. Acting on information from Nestor, the police arrested Tomas, David, and appellant several hours later. After searching Tomas's apartment, the police recovered the gun used in the shooting as well as masks and latex gloves.
>
> Evidence revealed a member of a Mexican drug cartel offered to pay Tomas $15,000 to kill Aguirre to avenge the death of his brother, who Aguirre killed some twenty years earlier in self defense. Although the undisputed evidence showed that appellant drove the men to Aguirre's house and picked them up after the shooting, it conflicted on the extent of appellant's involvement in Aguirre's murder and his knowledge of what was to occur.
>
> David Hernandez testified for the State and acknowledged he was offered ten years in prison in exchange for his "truthful testimony." David testified he, Tomas, and appellant planned Aguirre's murder two weeks earlier. David said the three met at Tomas's apartment, where Tomas showed him and appellant a picture of Aguirre. The picture looked like it had been printed off a computer; in it, Aguirre was standing in the front yard of a house. According to David, the plan called for Tomas to be the gunman, David to be his backup, and appellant to be the driver, that is, he was "to take them and get them out of there." Although it was "never spoken" how much money he and appellant were to receive, David said there was an understanding they would be paid. David also said it was clear at the meeting that "someone was going to be killed."
>
> On the night of the shooting, Tomas and appellant picked up David and Nestor. Although Nestor was not part of the original plan, he came along as backup. Before getting out of the car, Tomas and Nestor put on bandanas to cover their faces, and David

covered his face with a ski mask; all three were wearing latex gloves. Tomas had a gun. The men did not take their cell phones, wallets, or identification because they did not want to accidentally leave "anything in the house."

David said appellant dropped them off in front of Aguirre's house. After Tomas shot Aguirre, the three men ran out of the house to where appellant was supposed to be, but the car was gone. The men continued running and, along the way, they threw their masks, gloves, and the gun in some bushes. Nestor could not keep up and became separated from Tomas and David. Tomas and David ran to a nearby motel, where they got change so they could make a phone call. A videotape of the two at the motel showed them slapping hands in a congratulatory manner. From the motel, the two walked to a convenience store next door and used the pay phone to call appellant. Less than two minutes later, appellant picked them up. A videotape depicted Tomas making the phone call and a car picking them up. David said when he asked appellant where he had been, appellant said he was "there" and saw the men running and flashed his lights to get their attention.

Appellant took the men back to Tomas's apartment. David said everyone was in a panic about Nestor and said they wanted to find him before he was caught. David, appellant, and Tomas's girlfriend went back to the area to look for Nestor. They retrieved the masks, gloves, and gun but could not find Nestor. David, Tomas, and appellant spent the night at Tomas's apartment and were arrested that morning after leaving; according to David, they were on their way to pick up the money for killing Aguirre.

In contrast to David's testimony, appellant denied planning Aguirre's murder with David and Tomas. He told jurors that Tomas was like a brother to him and had protected him from bullies when he was in middle school. He said he was at Tomas's apartment on the night of the shooting and had planned to go to the cemetery at midnight to visit his cousin's grave. As he was leaving, Tomas asked for a ride. Appellant said he took Tomas to David's house, where they picked up David and Nestor. Appellant said he dropped off Tomas, David, and Nestor a few blocks from the cemetery, which was near Aguirre's neighborhood, and did not plan to pick them up. He said he did not see any guns or masks. Later, Tomas called and asked appellant to pick him up. Appellant told Tomas he would be there "in a little bit." After picking up David and Tomas, appellant said he dropped them off at a nearby apartment while, at Tomas's request, he went back to the area to look for Nestor. Appellant said he did not ask questions. He looked for five or ten minutes but did not find Nestor. He said there were police cars "all around," but he "didn't know what was going on." He denied spending the night at Tomas's and said he went home and then returned to Tomas's apartment the next morning.

On cross-examination, appellant admitted he took Tomas to Aguirre's neighborhood earlier on the day of the shooting; he said Tomas got out and walked around while he cruised around the neighborhood for about thirty minutes. Although he testified he did not know why Tomas wanted to go to that area, he acknowledged telling

the police that Tomas mentioned "hitting a lick," or robbing someone. He testified he did not know what Tomas's intentions were or who he was going to rob. He could not explain why the police, who had Tomas's apartment under surveillance for several hours after the shooting, did not see him go into the apartment the next morning if, as he testified, he had returned to his apartment instead of spending the night.

Tomas, who had been convicted of capital murder for his part in Aguirre's death and had been sentenced to life in prison without parole, testified on appellant's behalf. Tomas acknowledged he was hired to kill Aguirre and was to be paid $15,000, a brick of cocaine, and the promise the cartel would "start connecting" him with drugs. He said appellant was not involved in the shooting and did not know that he was going to kill Aguirre; in fact, he denied that David knew what was going to happen. Rather, he said, appellant only knew that he and David planned to burglarize Aguirre's house and denied there was any meeting to plan the murder of Aguirre.

On the night of the shooting, Tomas said appellant was going to a cemetery down the street from Aguirre's house and he asked appellant to drop them off. In the car, there was talk about the type of goods they would steal, such as jewelry, money, TVs and similar "appliances," and drugs, if available. Tomas, who was in the front passenger seat, had a gun on his lap. Tomas gave conflicting testimony about whether appellant was supposed to wait for them. At one point, he acknowledged telling the police he figured appellant "got scared and moved the car." He also testified he asked appellant later on "what happened," and appellant "just said he left." But, at another point, he testified he had not told appellant to wait.

Contrary to appellant's version of events, Tomas denied that appellant took him to Aguirre's neighborhood earlier on the day of the shooting so that he could scope out Aguirre's house and denied telling police that story; instead he said his intermediary, Arturo Vargos, drove him out there. Both Tomas and appellant testified that Vargos was a relative of appellant's.

*Mendez v. State*, No. 05-10-01461-CR at *1-8.

## III. Discussion

### 1. Standard of Review

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254 provide:

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of

the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

**2. Indictment**

Petitioner's claims one through four challenge the sufficiency of the indictment. Petitioner raised these claims on state habeas review. The Court of Criminal Appeals denied the claims. Where the question of sufficiency of the indictment is presented to the highest state court of appeals, the issue is foreclosed in federal habeas proceedings. *Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009) (citing *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994)); *McKay*, 12 F.3d at 68 ("Where the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue."). These claims should therefore be denied.

**3. Jury Charge**

Petitioner argues the jury charge was defective because it allowed him to be convicted on

a theory of burglary that was not included in the indictment. Petitioner's claim, however, is procedurally barred.

Federal courts may not review a state court decision that rests on an adequate and independent state procedural default, unless the habeas petitioner shows cause for the default and "prejudice attributable thereto" or demonstrates that the failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989). When the last state court to review a claim clearly and expressly states that its judgment rests on a procedural bar, the procedural default doctrine generally bars federal review. *Id*; *Lowe v. Scott*, 48 F.3d 873, 875 (5th Cir. 1995).

In this case, Petitioner did not raise his jury charge claim on direct appeal, but did raise the claim in his state habeas petition. The state habeas court found the claim procedurally barred because Petitioner failed to raise the claim on direct review, *Ex parte Mendez* at 93-94.

Petitioner has stated no cause for his failure to raise this claim on direct review. He has also failed to demonstrate the need to prevent a miscarriage of justice. This exception is "confined to cases of actual innocence, 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). To establish the required probability that he was actually innocent, a petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show it was more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner has presented no new, reliable evidence showing that it was more likely than not that no reasonable juror would have convicted him. Petitioner has not overcome the state procedural bar. Accordingly, the

procedural default doctrine bars federal habeas relief on this claim.

**4. Ineffective Assistance of Counsel**

To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Even if counsel is proven deficient, a petitioner must prove prejudice. To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Id.* "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner claims his counsel (a) failed to move for a directed verdict based on the faulty indictment; (b) failed to object to the indictment; and (c) failed to object to the jury charge on the ground that it was based on a faulty indictment.

On state habeas review, defense counsel filed an affidavit responding to Petitioner's claims. *Ex parte Mendez* at 99-102. Counsel stated the original indictment charged Petitioner with the murder of Felix Aguirre in the course of robbery. On October 11, 2010, the State moved

to amend the indictment to charge Petitioner with the murder of Felix Aguirre in the course of burglary of a habitation. *Id.* at 47. On October 12, 2010, the court granted the amendment. *Id.* Defense counsel filed objections to the amendment, but the trial court denied the objections. *Id.* at 46. Defense counsel, therefore, did file objections to the amended indictment.

Defense counsel also stated he did not file a motion for directed verdict because he had no doubt the trial court would not have granted the motion. *Id.* at 99-102. In denying Petitioner's habeas petition, the habeas judge – who was also the trial judge, found there were no grounds for a directed verdict because the State had presented more than a scintilla of evidence to support a guilty verdict. *Id.* at 95. Finally, Petitioner claims the indictment was not properly amended, which caused the jury instructions on burglary to be improper. Petitioner, however, has failed to establish an improper amendment of the indictment. Defense counsel was therefore not ineffective for failing to object to the jury charge.

**5. Summary**

Petitioner is lawfully restrained because he has failed to prove that he has been denied a constitutionally protected interest. Accordingly, the state courts' determination to deny relief is not contrary to or does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**RECOMMENDATION**

This Court recommends that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be DENIED.

Signed this 22 day of December 2015.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).